# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2019 Session

## CARL WAYNE HIXSON ET AL. v. AMERICAN TOWERS, LLC

**Appeal from the Chancery Court for Hamilton County**
**No. 16-0804       Jeffrey M. Atherton, Chancellor**

———————————————————

### No. E2019-00335-COA-R3-CV

———————————————————

Wayne Hixson and Eric Hixson (the Hixsons) granted a perpetual, exclusive easement to American Towers, LLC (ATC)[1] to operate a telecommunications system at the top of a hill on their property. For many years, the hill experienced progressive slope failures. A recent mudslide caused thousands of dollars in property damage to the Hixsons and All Things Fast Motorsports, LLC (All Things Fast), a metal fabrication business owned by Wayne Hixson's grandson. ATC spent thousands of dollars to move a generator away from the slope failure. The parties fear that the cell tower could collapse. In the trial court, the Hixsons and All Things Fast filed a complaint seeking a declaratory judgment regarding the parties' respective maintenance responsibilities under the easement agreement. They also sought damages arising from ATC's alleged breach of the easement agreement and other tortious conduct. ATC filed a counterclaim alleging similar causes of action. After a bench trial, the court ruled that ATC has a duty to maintain the easement and that the Hixsons have a duty to maintain the surrounding hillside for the benefit of ATC. Because the court found that the Hixsons and ATC were equally at fault for failing to prevent the recent mudslide, the court rejected their claims of negligence and breach of the easement agreement. However, the court awarded $1,245.20 to All Things Fast on its negligence claim. The court also awarded $179.99 to the Hixsons on their trespass claim. Finally, the court ordered the Hixsons and ATC to pay half of the costs necessary to stabilize the hill in accordance with the remediation plan proposed by the Hixsons. ATC appeals. We modify the trial court's declaratory judgment, vacate the award of damages to All Things Fast, and remand for further proceedings. The judgment is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

---

[1] ATC was the abbreviation used in the proceedings below. From the record, it appears that ATC is the surviving entity of American Towers, Inc. Its parent corporation is American Towers Corporation.

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Marc H. Harwell, Chattanooga, Tennessee, for the appellant, American Towers, LLC.

Andrew F. Tucker, Dayton, Tennessee, for the appellees, Carl Wayne Hixson, Michael Eric Hixson, and All Things Fast Motorsports, LLC.

**OPINION**

**I.**

Wayne Hixson and his son, Eric Hixson, are licensed general contractors. They reside in Hamilton County. In 1996, the Hixsons decided to get involved in ARCA racing.[2] They purchased real property in Soddy-Daisy and built a racecar shop. The racecar shop is situated at the foot of a large hill that runs along the eastern edge of the property.

In February 1998, the Hixsons entered into a lease agreement with Chase Telecommunications, Inc. (Chase). The lease agreement gave Chase the exclusive right to use a portion of the hill on the Hixsons' property to "provid[e] communication services." A few months later, Specialty Constructors, Inc. (Specialty Constructors) constructed a cell tower and installed other related equipment on top of the hill.[3] An access road leading to the cell tower was also constructed. From the public highway, the access road is steeply uphill; then, after a dogleg to the left, the access road slopes downhill toward the cell tower for approximately 190 yards.

For the purposes of this appeal, it is undisputed that the builder of the cell tower dug approximately thirty feet into the hill and left between six and nine feet of extracted fill dirt on top of the hill. Excess dirt from construction of the access road was also placed on top of the hill or thrown over the edge. Wayne Hixson claims that he expressed concerns about erosion and water runoff during the initial construction of the cell tower. In the end, nothing was done about the fill dirt. The builder leveled off the hill, constructed the cell tower, and installed other related equipment. Sometime between 1998 and 2000, ATC took over this telecommunications system by sub-lease from Chase or from one of its successors-in-interest.

---

[2] "ARCA" stands for Automobile Racing Club of America.

[3] Throughout this litigation, the parties repeatedly stated that *Chase* constructed the cell tower. On the last day of trial, however, ATC identified Specialty Constructors as the builder of the tower. In a post-trial motion, the Hixsons produced evidence that ATC later merged with OmniAmerica, Inc., the parent company of Specialty Constructors.

Eric Hixson testified that, in late 1999 or early 2000, part of the hill "broke off" and slid toward the racecar shop. He testified that "another mudslide" occurred in 2001. According to Wayne Hixson, "every time there was a big rain," the Hixsons would "have mud coming down through there on the rest of [their] property[.]" According to the Hixsons, water flows down the access road toward the cell tower and causes erosion of the hill. Wayne Hixson claims that he called ATC numerous times asking for their help, but he did not submit those requests in writing. According to the Hixsons, ATC was not responsive.

In 2003, the Hixsons attempted to take remedial action. They began constructing an RV garage directly below the cell tower, where the worst mudslides were occurring. They designed the rear wall of the RV garage to serve as a retaining wall. The Hixsons also installed a French drain around the perimeter of the RV garage to divert water runoff. The first four bays of the RV garage were completed in 2004.

Despite these efforts, the mud kept coming. In 2007, the Hixsons constructed another four bays adjacent to the existing RV garage. The Hixsons testified that they used a "skid steer Bobcat" to remove about four feet of dirt from the area in order to build the second part of the garage. The Hixsons insisted that they only excavated loose dirt that had eroded down the hillside and that they did not dig into the toe of the hill, which, they said, was marked by several large boulders. Over the next few years, mud continued sliding down the hill and piling up behind the RV garage.

In July 2010, the Hixsons and ATC executed an easement acquisition agreement. In that agreement, ATC promised to pay the Hixsons $496,500 in exchange for two easements: (1) a "perpetual, exclusive easement" to use the land beneath and around the cell tower; and (2) an "access and utility easement" to use the road leading to the cell tower. The Hixsons also promised to assign ATC all of their rights and obligations as landlords under the 1998 lease agreement. After closing, the parties recorded an easement agreement in the Register's Office of Hamilton County. The easement agreement sets forth the parties' rights and responsibilities in greater detail.

In 2013, ATC received complaints from its customers about ruts in the access road. In response, ATC construction manager Dale Melton sent ATC field operations technician Curtis Utz to inspect the property. Mr. Utz testified that he had inspected the property once per year since 2004 and had taken about fifty photographs of the cell tower and access road. Mr. Melton also hired a third-party company to inspect the property. According to Mr. Melton, the third-party company notified him in May 2014 that the hill appeared to be failing. ATC claims this was its first notice of the hill failure, despite the Hixsons' claims to the contrary and despite the fact that Mr. Utz had conducted annual inspections of the property for about a decade.

ATC retained GEOServices, LLC (GEOServices) to perform a geotechnical

- 3 -

exploration "to characterize the subsurface conditions for the existing slope[.]" On August 5, 2014, GEOServices published a report of its findings and recommendations. The report confirmed that the hill was failing. It recommended the use of soil nails to stabilize the hill. Shortly thereafter, ATC asked GEOServices to provide a design for a soil nail remediation plan that ATC could send to potential contractors. On August 27, 2014, GEOServices published a report of its soil nail remediation plan.

In December 2015, Soddy-Daisy experienced an extraordinary amount of rainfall. According to Wayne Hixson, it rained "four or five days in a row" leading up to Christmas. He testified that "the total rainfall was about seven inches" and that it rained "about two inches" on Christmas eve. On Christmas day, the Hixsons discovered that there had been another mudslide. This time, a tree and "about two loads of chert" crashed through the roof of the RV garage. This damaged the RV garage and equipment owned by the Hixsons and All Things Fast. As a precaution, ATC spent about $25,000 to move a generator away from the slope failure. ATC also placed a tarp over part of the slope.

In 2016, ATC finally got around to repairing the access road. Patrick Barry, ATC's Director of Architectural Engineering, supervised this project. Mr. Barry testified that ATC graded the access road using crusher run, which is designed to withstand erosion. Mr. Barry also testified that ATC dug a ditch along the eastern side of the road and "pitched" the road from west to east so that water would run into the ditch. Finally, ATC constructed a "level spreader" at the end of the access road near the cell tower. The level spreader was designed to collect water from the ditch and discharge it to the east of the Hixsons' property. Dr. James Smoot, a hydrologist, testified that ATC's 2016 improvements were properly designed to direct water away from the Hixsons' property.

On December 7, 2016, the Hixsons and All Things Fast filed their complaint. They sought: a declaratory judgment regarding the parties' maintenance responsibilities under the easement agreement; $40,000 in damages arising from ATC's alleged breach of the easement agreement and other tortious conduct[4]; punitive damages; "[a] yet undetermined sum to correct the erosion and water runoff issues"; attorney's fees and costs; and "[a]ll other general relief deemed just and proper[.]"

In its "Answer and Verified Counterclaim," ATC denied responsibility for the hill failure and asserted a variety of defenses, including: failure to state a claim upon which relief can be granted; comparative fault; and "all applicable statute[s] of limitations and statutes of repose[.]" ATC also sought: an unspecified amount of damages arising from the counter-defendants' alleged negligence and breach of the easement agreement; "an Order compelling the [Hixsons] to take immediate measures and corrective action to

---

[4] Specifically, the Hixsons and All Things Fast alleged the following torts: negligence, trespass, fraudulent inducement, intentional misrepresentation, negligent misrepresentation, and nuisance.

provide stabilization to the slope/hillside"; attorney's fees and costs; and "all other general relief deemed just and proper[.]"

In May 2017, the court held a hearing on ATC's request for injunctive relief. The court heard testimony from several witnesses and received twenty-one exhibits into evidence. Ultimately, the court denied ATC's request for injunctive relief and ordered the parties to attend mediation. When mediation was unsuccessful, both parties filed motions for summary judgment. The court denied both motions and set the case for trial.

A three-day trial took place from January 30, 2018 to February 1, 2018. The court heard testimony from ten witnesses, including the Hixsons, ATC representatives, and multiple expert witnesses. Pursuant to Tenn. R. Civ. P. 65.04(7), the court also considered the testimony and exhibits entered into evidence during the May 2017 hearing. The court set forth its findings of fact and conclusions of law in a twenty-page memorandum opinion and order filed on August 6, 2018.

The court "found the testimony of Wayne Hixson to be generally credible, though not always in the Hixsons' favor." On the other hand, the court found the testimony of Dale Melton and Patrick Berry to be "somewhat unpersuasive." For example, the court disbelieved Mr. Melton's testimony that ATC first received notice of the hill failure in May 2014. Instead, the court found that Curtis Utz, who conducted annual inspections of the property, "had almost as much of an opportunity as the Hixsons to observe the open and obvious erosion taking place on the hillside."

The court also made factual findings regarding the cause of the hill failure:

> [T]he original construction of the tower and tower pad in close proximity to the edge of the hill likely caused and contributed to the erosion. The proof at trial showed that, during the construction of the tower and tower pad, the builder dug down approximately thirty feet and left the extracted fill dirt on top of the hill, much of which was within the Easement area. This was specifically supported by the testimony of Mr. Hodnett, stating that the failure of [the] hill occurred at the top, rather than at the toe. That fill dirt has caused an excess of earth moving down the hill over the years since construction.

Although the court found that the original construction of the cell tower led to the instability of the hill, the court ruled that the Hixsons and ATC were equally at fault for failing to properly maintain their respective areas of the property. For example, the court found that ATC failed "to secure the dirt next to the concrete pad and within the Easement" and failed "to control water on the tower pad from running down the hillside

- 5 -

above the RV Garage[.]"[5]  On the other hand, the court found that the Hixsons failed to cover the bare hillside or promote the growth of vegetation on the hill, which, according to Dr. Smoot, would have prevented erosion.  To their credit, however, the court found that the Hixsons did *not* cut into the toe of the hill during the construction of the RV garage.

The court ruled that most of the parties' claims were without merit.  Relevant to this appeal, the court awarded $1,245.20 to All Things Fast on its negligence claim.  The court also awarded nominal damages to the Hixsons after finding that ATC trespassed on their property during ATC's 2016 improvements to the access road.  The court rejected ATC's claim against the Hixsons for breach of the easement agreement.  The court also ruled that the doctrine of comparative fault barred ATC from recovering on its negligence claim against the Hixsons.  Finally, the court rejected ATC's claims against All Things Fast because All Things Fast was not a party to the easement agreement and did not owe ATC a duty of care.[6]

In December 2018, the court held a third hearing on the issue of remediation. Jimmy Mason, a general contractor, testified on behalf of the Hixsons.  He recommended the construction of a larger retaining wall at the bottom of the hill, which he estimated would cost $332,480.  Mr. Mason's remediation plan had not been approved by a professional engineer at the time of the hearing.  Derek Kilday, the Vice-President and Senior Geotechnical Engineer at GEOServices, testified on behalf of ATC.  Mr. Kilday recommended the installation of soil nails at the top of the hill, which he estimated would cost $615,000.  Mr. Kilday believed that the installation of soil nails would be much safer for the construction workers.  However, he admitted that his remediation plan would not involve removal of the dirt that has piled up behind the RV garage.  At the conclusion of the hearing, the court stated the following:

> Although less sophisticated, the testimony provided by Mr. Mason provides a more comprehensive approach to the retention of the hillside.  I heard Mr. Kilday testify, and I even followed it up, [his] primary concern with regard to the poured wall approach dealt with the safety of the workers, not with the efficacy of the structure.

---

[5] We assume the latter finding is limited to ATC's pre-2016 conduct, because the court credited Dr. Smoot's testimony that ATC's 2016 improvements to the access road were properly designed to direct water away from the Hixsons' property.

[6] The memorandum opinion and order also states that "[a]ny matters not otherwise addressed in this Memorandum Opinion and Order are hereby denied and/or dismissed."  We interpret this as a denial of the Hixsons' request for punitive damages and both parties' request for attorney's fees and costs.

Under the circumstances, based upon the proof presented to me, and we're looking for a long term comprehensive fix, rather than the somewhat more narrow approach that the soil nails would provide, the testimony provided to the Court persuades this Court that the poured wall approach presented and suggested by Mr. Mason at the cost of $332,480 is the most appropriate mechanism to effect the security of this hillside.[7]

The court ordered the Hixsons and ATC to pay half of the costs necessary to stabilize the hill in accordance with the remediation plan proposed by the Hixsons. ATC appealed. Later, upon motion of the parties, the court entered an agreed order staying enforcement of its judgment pending the resolution of this appeal.

## II.

Although not stated as such, ATC raises the following issues:

Whether the Hixsons' claims are barred by the three-year statute of limitations set forth in Tenn. Code Ann. § 28-3-105.

Whether the trial court erred by declaring that ATC has a duty under the easement agreement to maintain the easement on top of the hill.

Whether the trial court erred by rejecting ATC's claim against the Hixsons for breach of the easement agreement.

Whether the trial court erred by rejecting ATC's negligence claim against the Hixsons.

Whether the trial court erred by awarding $1,245.20 to All Things Fast on its negligence claim.

Whether the trial court erred by ordering the parties to repair the hill in accordance with the Hixsons' remediation plan.

Whether the trial court erred by ordering ATC to pay half of the costs necessary to implement the remediation plan.

---

[7] This oral ruling was incorporated by reference in the court's January 23, 2019 "Final Order of Remediation."

The Hixsons raise one additional issue:

> Whether the prevailing party in this appeal is entitled to an award of reasonable attorney's fees and costs.

Although the trial court rejected most of the Hixsons' claims, the Hixsons do not challenge those rulings in this appeal. Nor do the Hixsons challenge the court's ruling that they must pay for half of the costs of remediation.

## III.

This case comes to us after a bench trial. Therefore, our review of the trial court's factual findings "shall be de novo upon the record" and "accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(b). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Dorning v. Bailey*, 223 S.W.3d 269, 272 (Tenn. Ct. App. 2007) (citations omitted). We give great weight to credibility determinations made by the trial court. *Id.* On the other hand, we review questions of law de novo, without affording a presumption of correctness to the conclusions of the court below. *Id.*

## IV.

The first issue raised by ATC is whether the Hixsons' claims are barred by the three-year statute of limitations set forth in Tenn. Code Ann. § 28-3-105. We decline to chase that rabbit. The trial court ruled *against* the Hixsons on all but one of their claims. Because the Hixsons are not challenging any aspect of the trial court's decision, the statute-of-limitations issue is moot with respect to the Hixsons' unsuccessful claims. The Hixsons were successful on their trespass claim, but ATC's brief does not include facts or argument relevant to that claim. Therefore, ATC waived the statute-of-limitations defense with respect to that claim. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) (citations omitted) ("An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7).").[8]

## V.

The second issue raised by ATC concerns the trial court's declaratory judgment regarding the parties' maintenance responsibilities under the easement agreement. We

---

[8] ATC also waived the statute-of-limitations defense with respect to All Things Fast's negligence claim. *See Hodge*, 382 S.W.3d at 335 ("[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4).").

begin by discussing common law principles that will inform our analysis of this issue. Then we will turn to the easement agreement itself.

## A.

"An easement is an interest in another's real property that confers on the easement's holder an enforceable right to use that real property for a specific purpose." **Shew v. Bawgus**, 227 S.W.3d 569, 578 (Tenn. Ct. App. 2007) (citations omitted). "[A]n easement carries rights and restrictions applicable to the owner of the easement (the dominant estate) and the owner of the property underlying and adjoining the easement (the servient estate)." **Rogers v. Roach**, No. M2011–00794–COA–R3–CV, 2012 WL 2337616, at *8 (Tenn. Ct. App., filed June 19, 2012):

> [T]he rights of the easement owner and of the landowner are not absolute, irrelative, and uncontrolled, but are so limited, each by the other, that there may be a due and reasonable enjoyment of both the easement and the servient estate.

**Id.** (quoting **Carroll v. Belcher**, No. 01A01-9802-CH-00106, 1999 WL 58597, at *1 (Tenn. Ct. App., filed Feb. 9, 1999)). Thus, "[t]he owner of an easement cannot materially increase the burden of it upon the servient estate[.]" **Mize v. Ownby**, 225 S.W.2d 33, 35 (Tenn. 1949) (citations omitted); *see also* **Rogers**, 2012 WL 2337616, at *8. Likewise, "[t]he owner of the servient estate has no legal right to interfere with an easement holder's enjoyment and use of the easement." **Rogers**, 2012 WL 2337616, at *9 (citing **Charles v. Latham**, No. E2003-00852-COA-R3-CV, 2004 WL 1898261 (Tenn. Ct. App., filed Aug. 25, 2004)); *see also* **Cox v. East Tenn. Natural Gas Co.**, 136 S.W.3d 626, 628 (Tenn. Ct. App. 2003).

Absent an agreement to the contrary, an easement holder "has both a right and the duty to maintain an easement so that it can be used for its granted purpose[.]" 28A C.J.S. Easements § 227; *see also* 25 Am. Jur. 2d Easements and Licenses § 72. "The owner of the dominant estate may do whatever is reasonably necessary to the enjoyment of the easement and to keep it in a proper state of repair . . . ." **Hager v. George**, No. M2013–02049–COA–R3–CV, 2014 WL 3371680, at *5 (Tenn. Ct. App., filed July 8, 2014) (quoting 28A C.J.S. Easements § 227). The easement holder may even "enter the servient estate in order to maintain, repair or protect the easement" as long as such maintenance is "necessary" and performed "in a reasonable manner as not to increase needlessly the burden of the servient estate." **Id.** On the other hand, "[t]he owner of a servient estate generally has no duty to maintain or repair an easement for the benefit of the dominant tenant in the absence of an agreement requiring it." 28A C.J.S. Easements § 227; *see also* 25 Am. Jur. 2d Easements and Licenses § 72. Instead, the owner of the servient estate must simply "abstain from acts that are inconsistent with the easement." 28A C.J.S. Easements § 191.

The Supreme Court has also explained the extent to which landowners have a duty to provide lateral support to adjoining land. ***XI Properties, Inc. v. RaceTrac Petroleum, Inc.***, 151 S.W.3d 443 (Tenn. 2004). "[T]he traditional common law view [is] that land in its natural state is entitled to lateral support from the adjoining land." ***Id.*** at 447. However, when "a landowner alters his land by filling, thus raising the level of the land above its natural state, there is no right of lateral support from adjoining landowners with respect to the altered portion of the land." ***Id.*** at 448. On the contrary,

> landowners who raise their land above the natural level are under a duty to "keep the dirt from encroaching upon [their] neighbor's land." . . . This duty includes, if necessary, the building of a retaining wall or other structure to protect the neighbor's land.

***Id.*** (citations omitted); *see also* 1 Am. Jur. 2d Adjoining Landowners § 45.

**B.**

With these common law principles in mind, we now turn to the easement agreement itself. An easement agreement is a contract, and the interpretation of a contract is a question of law that we review de novo. ***Wood v. Metro. Gov't of Nashville and Davidson Co.***, No. M2008-02570-COA-R3-CV, 2009 WL 2971052, at *3 (Tenn. Ct. App., filed Sept. 16, 2009). We strive to "interpret contracts so as to ascertain and give effect to the intent of the contracting parties." ***Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.***, 566 S.W.3d 671, 694 (Tenn. 2019). The written words of a contract are "the lodestar of contract interpretation." ***Id.*** We generally interpret words according to "the usual, natural, and ordinary meaning of the contractual language[.]" ***Id.*** at 691 (citations omitted). If the words of a contract are clear and unambiguous, we apply their plain meaning. ***Id.*** at 691. However, if the words of a contract are ambiguous (i.e., susceptible to more than one reasonable interpretation), we must resort to "other rules of contract construction to determine the parties' intent." ***West v. Shelby Cty. Healthcare Corp.***, 459 S.W.3d 33, 42 (Tenn. 2014) (citing ***Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 659 (Tenn. 2013)). If a contract omits "a term that is necessary to a determination of [the parties'] rights and duties, a term which is reasonable may be supplied by the court." ***Dick Broadcasting Co., Inc. of Tennessee v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 667-68 (Tenn. 2013) (quoting ***German v. Ford***, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009)).

The trial court ruled that Sections 6 and 11 of the easement agreement require ATC to maintain its exclusive easement on top of the hill. The court also ruled that Sections 6(a), 9(a) and 10 of the easement agreement require the Hixsons to maintain the surrounding hillside for the benefit of ATC. In pertinent part, those sections provide as

- 10 -

follows:

6.  Use of Easement Areas

(a)  Exclusive Easement. . . .  At all times during the Term, [ATC] shall have the exclusive right to use and shall have free access to the Easements seven (7) days a week, twenty-four (24) hours a day. . . .  [the Hixsons] shall not have the right to use the Exclusive Easement for any reason and shall not disturb [ATC's] right to use the Exclusive Easement in any manner. . . .

(b)  Access and Utility Easement.  The Access and Utility Easement shall be used by [ATC] . . . for ingress and egress from and to the Exclusive Easement, as well as the construction, installation, operation and maintenance of overhead and underground [utilities]. . . .  [the Hixsons] shall not in any manner prevent access to, and use of, the Access and Utility Easement by [ATC] . . . and [the Hixsons] shall not utilize the Access and Utility Easement in any manner that interferes with [ATC's] . . . use of such area. . . .

\*     \*     \*

9.  Covenants and Agreements.

(a)  [The Hixsons] represent[ ] and warrant[ ] that [they are] the owner[s] in fee simple of the Easements, free and clear of all liens and encumbrances, and that [they] alone ha[ve] full right to grant the Easements and assign the Lease (as defined in Section 25 hereof).  [The Hixsons] further represent[ ] and warrant[ ] that [ATC] shall peaceably and quietly hold and enjoy the Easements during the Term without any hindrance, molestation or ejection by any party whomsoever.

\*     \*     \*

- 11 -

10.  Non-Disturbance.

During the Term, [the Hixsons] will not improve or grant any
other easement, ground lease, lease license, sale or other
similar interest of or upon the Premises if such improvement
or interest would interfere with [ATC's] use of the
Easements.  [ATC] and its customers are currently utilizing
the Exclusive Easement for the purpose of transmitting and
receiving telecommunication signals, including but not
limited to wireless telecommunications signals.  [The
Hixsons] and [ATC] recognize that [ATC's] use of the
easement rights set forth in this Agreement would be
frustrated if the telecommunications signals were blocked, if
an obstruction were built that would cause interference with
such transmission, or if access and/or utilities to and from the
Exclusive Easement were partially and/or completely
inhibited.  [The Hixsons], for [themselves], [their] successors
and assigns, hereby agree[ ] to use [their] best efforts to
prevent the occurrence of any of the foregoing, and shall
promptly undertake any remedial action necessary to do so.
[ATC] shall have the express right to seek an injunction to
prevent any of the activity prohibited by this Section 10.

11.  Access and Utilities.  To the extent not otherwise
addressed herein . . . [the Hixsons] hereby grant[ ] and
convey[ ] unto [ATC] . . . full, complete, uninterrupted and
unconditional access to and from the Exclusive Easement,
seven days a week, 24 hours a day, over and across any
adjacent property now or hereafter owned by [the Hixsons],
for, without limitation, ingress and egress to and from the
Exclusive Easement, as well as the construction, installation,
location, maintenance, relocation and repair of overhead
and/or underground utility connections . . . provided that
[ATC] shall repair any damages to the Premises caused by
such access. . . .

We respect the trial court's effort to cobble together a coherent set of maintenance
responsibilities from these scattered sections of the easement agreement.  As we see it,
however, the easement agreement fails to address this issue.

First, consider sections 6 and 11.  Section 6 gives ATC the exclusive right to *use*
the easement area on top of the hill, but that section does not say anything about ATC's
duty to *maintain* or *repair* the area.  At best, such a duty is implied; but in the absence of

- 12 -

more direct language, we find this section ambiguous. Section 11 requires ATC to "repair" the property, but this duty only extends to damages caused by ATC's "ingress and egress to and from the Exclusive Easement, as well as the construction, installation, location, maintenance, relocation and repair of overhead and/or underground utility connections [along the access road]." The damages sustained in this case did not arise from such activity. For the purposes of this appeal, section 11 is irrelevant.

Next, consider sections 6(a), 9(a), and 10. Sections 6(a) and 9(a) contain covenants of quiet enjoyment. In the landlord-tenant context, "[a] covenant of quiet enjoyment protects the lessee from any act of the lessor which destroys the quiet and beneficial enjoyment of the use of the property." *Couch v. Hall*, 412 S.W.2d 635, 619 (Tenn. 1969) (citations omitted). "The covenant of quiet enjoyment is breached when the landlord obstructs, interferes with, or takes away from the tenant in a substantial degree the beneficial use of the leasehold." 49 Am. Jur. 2d Landlord and Tenant § 473. The parties have not cited, and we have not identified, any cases holding that a covenant of quiet enjoyment abrogates the common law rule that the owner of a servient estate has no duty to maintain his property for the benefit of an easement holder. We are also not aware of any cases holding that a covenant of quiet enjoyment abrogates the common law rule that a landowner has no duty to provide additional lateral support to adjoining land that has been filled or otherwise changed from its natural state.

Finally, section 10 prohibits the Hixsons from "improv[ing] or grant[ing] any other easement, ground lease, lease license, sale or other similar interest of or upon the Premises if such improvement or interest would interfere with [ATC's] use of the Easements." According to section 10, improvements to the property could interfere with ATC's use of the easement "if the telecommunications signals were blocked, if an obstruction were built that would cause interference with such transmission, or if access and/or utilities to and from the Exclusive Easement were partially and/or completely inhibited." Although section 10 requires the Hixsons to use their "best efforts" to prevent the construction of improvements that will interfere with ATC's use of the easement, this section does not speak to whether the Hixsons have a general duty to maintain the surrounding hillside for the benefit of ATC.

We conclude that the easement agreement does not contain a description of the parties' maintenance responsibilities. As previously discussed, if a written agreement omits "a term that is necessary to a determination of [the parties'] rights and duties, a term which is reasonable may be supplied by the court." *Dick Broadcasting Co., Inc. of Tennessee*, 395 S.W.3d at 667-68 (quoting *German*, 300 S.W.3d at 706). The authors of the Restatement (Third) of Property have compiled a list of supplementary terms that may be supplied by the court when an easement agreement omits a term necessary to a determination of the parties' rights and duties. According to the Restatement,

> [u]nless the terms of a servitude . . . provide otherwise, duties

- 13 -

to repair and maintain the servient estate and the improvements used in the enjoyment of a servitude are as follows:

(1) The beneficiary of an easement or profit has a duty to the holder of the servient estate to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude that are under the beneficiary's control, to the extent necessary to

(a) prevent unreasonable interference with the enjoyment of the servient estate, or

(b) avoid liability of the servient-estate owner to third parties.

(2) Except as required by § 4.9,[9] the holder of the servient estate has no duty to the beneficiary of an easement or profit to repair or maintain the servient estate or the improvements used in the enjoyment of the easement or profit. . . .

Rest. (Third) of Property: Servitudes § 4.13 (2000).

These supplementary terms are consistent with the common law principles discussed in Part V(A) of this opinion. Absent an agreement to the contrary, an easement holder has the duty to maintain the easement so that the easement may be used for its intended purpose. 28A C.J.S. Easements § 227; *see also* 25 Am. Jur. 2d Easements and Licenses § 72. When reasonably necessary, the easement holder may also enter the servient estate to make repairs. ***Hager***, 2014 WL 3371680, at \*5. The owner of the servient estate generally has no duty to maintain the servient estate for the benefit of the easement holder; he must simply refrain from unreasonable interference with the easement holder's use of the easement. ***Rogers***, 2012 WL 2337616, at \*9; 28A C.J.S. Easements §§ 191, 227; 25 Am. Jur. 2d Easements and Licenses § 72.

Because the easement agreement does not directly address the parties' maintenance responsibilities, we hold that the supplementary terms set forth in the Restatement (Third) of Property: Servitudes § 4.13 are reasonable and should be supplied by law. Therefore, we modify the trial court's declaratory judgment regarding the parties' maintenance responsibilities. Specifically, we hold that: (1) ATC has a duty to

---

[9] Section 4.9 provides that "the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude." Rest. (Third) of Property: Servitudes § 4.9 (2000).

maintain the easement on top of the hill; and (2) the Hixsons do not have a duty to maintain the surrounding hillside for the benefit of ATC.

Although it is not clear whether the Supreme Court would extend its lateral support jurisprudence to disputes between a landowner and an adjoining easement holder, we would reach the same result under those rules. The hill on the Hixsons' property became unstable after ATC's predecessor-in-interest "alter[ed] [the hill] by filling, thus raising the level of the land above its natural state." *XI Properties, Inc.*, 151 S.W.3d at 448. Thus, the Hixsons would not have a duty to provide additional lateral support. *See id.* Instead, ATC, as the successor-in-interest, would have "a duty to 'keep dirt from encroaching upon [the Hixsons'] land.' " *See id.*

## VI.

Next, we will consider whether the trial court erred by rejecting ATC's breach of contract claim against the Hixsons. In order to prevail on a breach of contract claim, a plaintiff must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

It is undisputed that the easement agreement functions as a contract. ATC also presented uncontradicted evidence that it incurred "around $25,000" in damages as a result of moving its generator away from the slope failure. Therefore, the only issue is whether the Hixsons' actions constitute "a deficiency in the performance amounting to a breach [of the easement agreement]." *Id.*

In ATC's counterclaim, ATC alleged that the Hixsons breached Sections 9 and 10 of the easement agreement by digging into the toe of the hill when they constructed the RV garage. At trial, ATC argued that the Hixsons also breached the easement agreement in other ways.[10] For example, ATC argued that the Hixsons breached their implied duty of good faith and fair dealing by failing to disclose the erosion of the hillside prior to the parties' execution of the easement agreement. ATC also argued that the Hixsons breached Sections 9 and 10 of the easement agreement by failing to cover or promote the growth of vegetation on the surrounding hillside, which, according to Dr. Smoot, would have prevented further erosion. Finally, ATC claimed that Section 25 of the easement

---

[10] The Hixsons failed to object to this variance in the proof and pleadings in the trial court. Therefore, the issue is waived. *Wheeler v. City of Maryville*, 203 S.W.2d 924, 926 (Tenn. 1947); *Tolliver v. Tellico Village Property Owners Ass'n, Inc.*, 579 S.W.3d 8, 26 (Tenn. 2019) ("[A] trial court may exclude proof of an issue not fairly within the scope of the pleadings upon the objection of the adverse party."); *American Trust & Banking Co. v. Parsons*, 108 S.W.2d 187, 189 (Tenn. Ct. App. 1937) ("[A] variance between the pleadings and proof is not available upon appeal unless the variance is specifically pointed out at the trial . . . .").

agreement requires the Hixsons to indemnify ATC for the damages it sustained. All of ATC's arguments are without merit.

First, the Hixsons did not breach their implied duty of good faith and fair dealing. Wayne Hixson testified that he informed ATC about the condition of the hill on numerous occasions. The court found his testimony credible. We see no reason to disturb that credibility determination. The court also found that ATC had notice of the hill failure from the annual inspections conducted by Mr. Utz. The evidence preponderates in favor of that finding. Accordingly, we agree with the trial court that the Hixsons did not breach their implied duty of good faith and fair dealing by failing to disclose the condition of the hill prior to the execution of the easement agreement.

Second, the Hixsons' construction of the RV garage does not constitute a breach of the easement agreement. The Hixsons completed construction of the RV garage in 2007. The easement agreement was not executed until 2010. It is absurd to suggest that the Hixsons breached the easement agreement before it existed. Additionally, the evidence in the record preponderates in favor of the trial court's finding that the Hixsons did not cut into the toe of the hill. Derek Hodnett, a professional engineer, testified that if the Hixsons had cut into the toe of the hill, the retaining wall would have failed or the RV garage would have shifted. The court found Mr. Hodnett's testimony credible, and we decline to disturb that credibility determination.

Third, the Hixsons did not breach the easement agreement by failing to cover or promote the growth of vegetation on the surrounding hillside. As explained in Part V(B) of this opinion, the Hixsons did not have a duty under the easement agreement to maintain the servient estate for the benefit of ATC.

Lastly, ATC is not entitled to damages pursuant to Section 25 of the easement agreement. ATC argues that it is entitled to damages based on the following indemnity clause:

> [The Hixsons] agree[ ] to indemnify and agrees to hold [ATC] harmless with respect to any demands, claims, actions, causes of action, assessments, expenses, costs, damages, losses, and liabilities (including reasonable attorneys' fees and costs) *under the Lease* which relate to costs or actions first arising on or before the date of this Agreement.

(Emphasis added.) This is a red herring. Put aside the question of whether ATC's claim arose "on or before" the execution of the easement agreement. Section 25 concerns the Hixsons' assignment of their rights and obligations as landlords *under the 1998 lease agreement*. By its own terms, the indemnity clause cited above only applies to claims arising "under the Lease." Importantly, ATC's counterclaim is based on the Hixsons'

alleged breach of the easement agreement, not the lease agreement. For the purposes of this appeal, section 25 is irrelevant.

For all of the foregoing reasons, we affirm the trial court's ruling that ATC is not entitled to damages on its claim for breach of the easement agreement.

## VII.

Now we consider whether the trial court erred by rejecting ATC's negligence claim against the Hixsons.

> In order to establish a prima facie claim of negligence . . . a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *see also **Naifeh v. Valley Forge Life Ins. Co.***, 204 S.W.3d 758, 771 (Tenn. 2006).

***Giggers v. Memphis Housing Auth.***, 277 S.W.3d 359, 364 (Tenn. 2009).

"[D]uty . . . is the legal obligation of a defendant to conform to a reasonable person's standard of care in order to protect against unreasonable risks of harm." ***Id.*** (citations omitted). We have already explained the scope of the Hixsons' duty of care under the common law. As the owners of the servient state, the Hixsons have the right to use their property in any manner that does not "unreasonably interfere" with ATC's use of the easement. *See **Cox v. East Tenn. Natural Gas Co.***, 136 S.W.3d 626, 628 (Tenn. Ct. App. 2003). The Hixsons do not have an affirmative duty to maintain the servient estate for the benefit of ATC. 28A C.J.S. Easements § 227; 25 Am. Jur. 2d Easements and Licenses § 72; *see also **XI Properties, Inc.***, 151 S.W.3d at 448 ("[When] a landowner alters his land by filling, thus raising the level of the land above its natural state, there is no right of lateral support from adjoining landowners with respect to the altered portion of the land."); 1 Am. Jur. 2d Adjoining Landowners § 45. Because the Hixsons did not have a duty to maintain the hillside for the benefit of ATC, we affirm the trial court's conclusion that ATC is not entitled to damages on its negligence claim.

## VIII.

Next we consider whether the trial court erred by awarding $1,245.20 to All Things Fast on its negligence claim against ATC. Although not clearly articulated by the parties or the trial court, All Things Fast's negligence claim is a premises liability action. In order to prevail on a premises liability claim, the plaintiff

must prove the elements of a negligence claim, *and in addition*, must prove either that "the condition was caused or created by the owner, operator, or his agent," or "if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident."

***Parker v. Holiday Hospitality Franchising, Inc.***, 446 S.W.3d 341, 350 (Tenn. 2014) (emphasis in original) (footnote omitted) (quoting ***Blair v. West Town Mall***, 130 S.W.3d 761, 764 (Tenn. 2004)).

In premises liability cases, the owner or possessor of land has a duty "to exercise due care under all the circumstances." ***Id.*** (citing ***Blair v. West Town Mall***, 130 S.W.3d 761, 764 (Tenn. 2004)). This duty includes "the responsibility of either removing, or warning against, any dangerous condition on the premises of which the property owner is actually aware or should be aware through the exercise of reasonable diligence." ***Parker***, 446 S.W.3d at 350 (quoting ***Eaton v. McLain***, 891 S.W.2d 587, 594 (Tenn. 1994)). Owners and possessors of property must exercise this same standard of care with regard to persons *off the premises* when the foreseeability and gravity of harm outweigh the burden imposed by engaging in safer, alternative conduct. *See* ***Hale v. Ostrow***, 166 S.W.3d 713, 716-18 (Tenn. 2005); ***Howell v. Nelson Gray Enters.***, No. E2019-00033-COA-R3-CV, 2019 WL 4127393, at \*4 (Tenn. Ct. App., filed Aug. 30, 2019); ***Estes v. Peels***, No. E1999-00582-COA-R3-CV, 2000 WL 1424808, at \*5-7 (Tenn. Ct. App., filed Sept. 21, 2000); ***De Ark v. Nashville Stone Setting Corp.***, 279 S.W.2d 518, 521 (Tenn. Ct. App. 1955).

Here, ATC owed a duty of reasonable care toward All Things Fast. It was extremely foreseeable that a major mudslide would cause significant damage to the RV garage where the Hixsons and All Things Fast stored their equipment. These factors outweighed ATC's burden of taking steps to remedy the erosion and water runoff issues. ATC breached this duty by failing to take such action until after the December 2015 mudslide. And, as previously explained, the evidence preponderates in favor of the trial court's finding that the excess fill dirt and water runoff issues were the actual and proximate cause of the hill failure. It is undisputed that All Things Fast suffered $2,490.41 in damages. Finally, although the dangerous condition of the hill was created by someone other than ATC, the evidence preponderates in favor of the trial court's finding that ATC "had actual or constructive notice that the condition existed prior to the accident." ***Parker***, 446 S.W.3d at 350. Thus, all of the elements of a premises liability action are present.

In its answer, ATC asserted the defense of comparative fault by alleging

- 18 -

wrongdoing on the part of the Hixsons, All Things Fast, and the original builder of the cell tower.[11] The trial court found that the Hixsons and ATC were equally at fault for the December 2015 mudslide, but the court did not allocate any fault to the builder of the cell tower or All Things Fast. Because the court found that ATC was fifty percent at fault, the court ordered ATC to pay All Things Fast fifty percent of its damages – that is, $1,245.20.

Our review of the trial court's allocation of fault is de novo with a presumption of correctness, unless the evidence preponderates otherwise. *Lindgren v. City of Johnson City*, 88 S.W.3d 581, 584 (Tenn. Ct. App. 2002) (citing Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000)). Under Tennessee's system of modified comparative fault, the trier of fact "should first determine the total amount of the plaintiff's damages without regard to fault, and then apportion damages on the percentage of fault attributable to each tortfeasor." *Id.* at 585 (citing *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000)). Importantly, the trier of fact may allocate fault "to *all* persons involved in an injury-causing event[,]" including non-parties. *Carroll v. Whitney*, 29 S.W.3d 14, 21 (Tenn. 2000) (emphasis added) (footnote omitted). This includes non-parties that are shielded from liability by a statute of repose. *Dotson v. Blake*, 29 S.W.3d 26, 29 (Tenn. 2000) ("[T]he trier of fact should be allowed to consider the fault of a tortfeasor who is protected from liability due to a statute of repose."). "[I]n cases of multiple tortfeasors, [the] plaintiff will be entitled to recover so long as [the] plaintiff's fault is less than the combined fault of all tortfeasors." *McIntyre v. Balentine*, 833 S.W.2d 52, 58 (Tenn. 1992).

In this case, the trial court's own factual findings do not support the court's allocation of fault. For example, the court found that "the original construction of the tower and tower pad in close proximity to the edge of the hill likely caused and contributed to the erosion." Yet, the court did not allocate any fault to Specialty Constructors. It is immaterial that Specialty Constructors was not a party to this suit or that Specialty Constructors may be shielded from liability by the construction statute of repose. *See Dotson*, 29 S.W.3d at 29; *Carroll*, 29 S.W.3d at 21. The court also failed to allocate fault to All Things Fast, despite finding that All Things Fast stored its equipment in close proximity to an "open and obvious" danger. *See Allen v. Sulcer*, 255 S.W.3d 51, 59 (Tenn. Ct. App. 2007) (citing *Coln v. City of Savannah*, 966 S.W.2d 34, 43 (Tenn. 1998), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000)) ("If an application of the balancing test yields a duty of care on the part of the defendant, the facts supporting an open and obvious risk of danger remain relevant to the comparative fault analysis."). Finally, the court erred by finding the Hixsons fifty percent

---

[11] Although ATC did not identify Specialty Constructors as the builder, ATC alleged, "[u]pon information and belief, [that] Chase Telecommunications, Inc., *or a company retained by Chase Telecommunications, Inc.*, designed and constructed all parts of the Easement at issue in this case[.]" (Emphasis added.)

at fault. As explained in Part V(B) of this opinion, it was *ATC's* responsibility to maintain its exclusive easement to the extent necessary to "avoid liability of the servient-estate owner to third parties." Rest. (Third) of Property: Servitudes § 4.13 (2000) (emphasis added).

We affirm the trial court's conclusion that ATC negligently maintained its easement to the detriment of All Things Fast; however, we vacate the trial court's award of damages to All Things Fast. On remand, and without hearing further proof, the trial court should determine the percentage of fault attributable to ATC, Specialty Constructors, and All Things Fast. In making that determination, the court should consider "all the circumstances of the case," including, but not limited to, the factors discussed in **Eaton v. McLain**, 891 S.W.2d 587, 592 (Tenn. 1994). If All Things Fast's percentage of fault is less than the combined fault of all the tortfeasors, then the court shall order ATC to pay All Things Fast damages in direct proportion to ATC's percentage of fault.

## IX.

The next issue is whether the trial court erred by ordering the parties to repair the hill in accordance with the remediation plan proposed by the Hixsons. A trial court has discretion to fashion an appropriate equitable remedy given the particular circumstances of each case. *E.g.*, **Winquist v. Goodwin**, No. E2009–02597–COA–R3–CV, 2010 WL 4272703, at *3 (Tenn. Ct. App., filed Oct. 28, 2010); **Morrow v. Jones**, 165 S.W.3d 254, 258 (Tenn. Ct. App. 2004).

> A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

"If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative." **Patty v. Lane**, No. E2012–01787–COA–R3–CV, 2013 WL 3421928, at *5 (Tenn. Ct. App., filed July 3, 2013) (citing **White v. Vanderbilt Univ.**, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

Here, the trial court was presented with two potential remediation plans. Jimmy Mason, a licensed general contractor, recommended the construction of a larger retaining wall at the bottom of the hill, which he estimated would cost $332,480. Mr. Mason made this recommendation after observing the Hixsons' property and consulting with a professional engineer. He did not have access to prior slope stability studies. At the time of the December 2018 hearing, Mr. Mason had not obtained design drawings from a

- 20 -

professional engineer.

Derek Kilday, a professional engineer at GEOSerivices, testified that "a concrete wall could be installed" but that "until fully analyzed, any costs associated with said wall means nothing essentially." Mr. Kilday also testified that he was "primarily concerned about [the] safety of workers at the bottom of the slope." Instead of a retaining wall, Mr. Kilday recommended the installation of soil nails at the top of the hill. Mr. Kilday claims that this approach is much safer for the construction workers. The estimated cost of this remediation plan is $615,000. Mr. Kilday testified that his plan would not involve excavation of the excess fill dirt that has already eroded down the hill and piled up around the RV garage.

The trial court ultimately ordered the parties to repair the hill in accordance with Mr. Mason's remediation plan. The court observed that Mr. Mason's plan was "less sophisticated" but "more comprehensive" in nature because it would involve the excavation of the dirt presently surrounding the RV garage. The court also noted the significantly lower price of this plan. Finally, the court observed that Mr. Kilday's concern with the retaining wall was the safety of the construction workers and not the efficacy of the structure.

Both remediation plans presented to the trial court have their advantages and disadvantages. As the trial court observed, the Hixsons' proposed plan is more preliminary in nature, but it is cheaper and more comprehensive. ATC's proposed plan has already been approved by a professional engineer, but it is more expensive and fails to address the excess dirt surrounding the RV garage. It is unclear which plan would be safer for construction workers. Mr. Mason testified that his plan could be executed safely. Mr. Kilday disagrees and thinks soil nails are safer. However, Patrick Barry, an ATC engineer, testified in a deposition that ATC previously ruled out a soil nail remediation plan because he believes the use of soil nails is unsafe in this context.

Because we think that both proposals are "within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative." *See* **Patty v. Lane**, 2013 WL 3421928, at *5. We hold that the trial court did not abuse its discretion when it ordered the parties to repair the hill in accordance with the plan remediation plan proposed by the Hixsons.

## X.

The last issue raised by ATC is whether the trial court erred when it ordered ATC to pay for half of the costs necessary to implement the remediation plan. Given our holding that ATC has a duty to maintain the easement and that the Hixsons do not have a duty to maintain the surrounding hillside for the benefit of ATC, it follows that ATC should bear the entire cost of remediating the hill. The Hixsons, however, are not asking

- 21 -

this Court to shift the entire cost of remediation to ATC. Instead, the Hixsons ask us to affirm the trial court's ruling that the parties should each pay half of the costs necessary to implement the Hixsons' proposed remediation plan. We will do just that and no more. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## XI.

Finally, the Hixsons ask us to consider whether the prevailing party is entitled to an award of reasonable attorney's fees and costs resulting from this appeal. Tennessee courts follow the "American-Rule," which provides that

> a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case.

*Eberbach v. Eberbach*, 535 S.W.3d 467, 474 (Tenn. 2017) (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009)).

In this case, section 21 of the easement agreement contains a provision regarding attorney's fees:

> If there is any legal action or proceeding between Grantor or Grantee arising from or based on this Agreement, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorney's fees and disbursements incurred by such prevailing party in such action or proceeding and in any appeal in connection therewith. If such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorney's fees and disbursements shall be included in and as a part of such judgment.

We find this provision of the easement agreement clear and unambiguous. Because the Hixsons are the prevailing parties in this appeal, we hold that ATC is required to pay all costs and expenses, including reasonable attorney's fees, incurred by the Hixsons as a result of this appeal. However, neither the Hixsons nor ATC were "prevailing parties" in the trial court; therefore, the parties shall pay their own attorney's fees incurred during the proceedings below.

## XII.

In conclusion, we modify the trial court's declaratory judgment, vacate the award of damages to All Things Fast, and remand for further proceedings consistent with this opinion. The judgment is affirmed in all other respects. Pursuant to section 21 of the easement agreement, costs on appeal (including reasonable attorney's fees) are taxed to the appellant, ATC.


_____
CHARLES D. SUSANO, JR., JUDGE